# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                         :

MICHAEL A. ROMERO,         :
                         :

         Plaintiff,         :      Civ. No. 13-7695 (FLW) (DEA)
                         :

     v.                  :
                         :

ABU AHSAN,             :      **OPINION**
                         :

         Defendant.     :
_____  :


**FREDA L. WOLFSON, U.S.D.J.**:

## I.     INTRODUCTION

Plaintiff, Michael A. Romero ("Romero" or "Plaintiff"), is a state prisoner who was, at all relevant times, incarcerated at New Jersey State Prison ("NJSP"), in Trenton, New Jersey.[1] Romero initially filed a *pro se* civil-rights complaint under 42 U.S.C. § 1983 in December 2013, (Compl., ECF No. 1), but he is now represented by *pro bono* counsel (*see* ECF Nos. 45–47). Defendant, Abu Ahsan ("Ahsan" or "Defendant"), previously moved for summary judgment, under Federal Rule of Civil Procedure 56, on the basis that Romero failed to exhaust administrative remedies and also on the merits of Romero's claims. (Mot., ECF No. 58.)  After the motion was fully briefed, the Court found questions of fact concerning whether Romero had exhausted administrative remedies and ordered the parties to appear for an evidentiary hearing. (ECF Nos. 67 & 68.)  Consequently, the Court denied the motion for summary judgment without prejudice, and advised that the merit portions of the motion would be reinstated if the action was

---

[1]  While still serving his New Jersey sentence, Romero is now incarcerated at a facility in Arizona.  (*See* Letter from Surinder K. Aggarwal (Aug. 5, 2016), ECF No. 66.)

not disposed of on the exhaustion issue. (*Id.*) The Court held an evidentiary hearing on exhaustion on June 9, 2017, and subsequently directed the litigants to engage in additional discovery and file supplemental submissions with the Court. (*See* Tr. of Hr'g (June 9, 2017), ECF No. 86.) The parties have now completed additional discovery and filed supplemental briefs, (ECF Nos. 89 & 90), and the matter is ready for resolution. For the following reasons, the Court finds that Ahsan has failed to establish his affirmative defense that Romero's claims are barred by a failure to exhaust administrative remedies. Furthermore, the Court reinstitutes the other portions of the motion for summary judgment, and that motion is GRANTED.

## II. BACKGROUND

### A. Underlying Facts

On December 28, 2011, Romero injured his right knee while playing basketball in the prison yard. (*See* Def.'s Br. in Support, Statement of Undisputed Material Facts, ECF No. 58-2, ¶ 1; Pl.'s Responsive Statement of Facts, ECF No. 62-6, ¶ 1.) Romero was admitted to the infirmary and received treatment from Ahsan, the NJSP medical director. (ECF No. 58-2 ¶¶ 5–22; ECF No. 62-6 ¶¶ 5–22.) Ahsan prescribed Romero crutches, range-of-motion exercises, and a pain reliever. (ECF No. 58-2 ¶¶ 5–14; ECF No. 62-6 ¶¶ 5–14.) Following an x-ray on December 29, 2011, Ahsan diagnosed Romero as suffering an acute knee sprain with possible ligamentous injury and ordered a magnetic-resonance-imaging ("MRI") scan of Romero's knee. (ECF No. 58-2 ¶¶ 6–9; ECF No. 62-6 ¶¶ 6–9.) On January 12, 2012, after an MRI scan, Ahsan modified the diagnosis to an acute right knee sprain with a complete tear of the anterior cruciate ligament ("ACL"), medial meniscal tear, and lateral ligament tear, and he ordered an orthopedic consultation "ASAP for likely surgery." (ECF No. 58-2 ¶¶ 15–18; Pl.'s Statement of Undisputed

Material Facts, ECF No. 62-5, ¶ 10; ECF No. 62-6 ¶¶ 15–18; Def.'s Response to Pl.'s Statement

of Undisputed Material Facts, ECF No. 65-2, ¶ 10.)

Romero had an initial orthopedic consultation, and the resulting proposed treatment plan

included use of a knee immobilizer for two weeks and a hinged knee brace for the following

three months. (ECF No. 58-2 ¶ 19; ECF No. 62-6 ¶ 19.) Romero received a knee immobilizer

on January 18, 2012. (ECF No. 58-2 ¶ 20; ECF No. 62-6 ¶ 20.) At the end of January 2012,

Romero had an orthopedic consultation with non-party Ahmar Shakir ("Shakir"), who

recommended surgery to reconstruct the ACL and the posterior cruciate ligament ("PCL") and

directed that Romero be sent to a "tertiary care center"[2] for evaluation. (ECF No. 58-2 ¶¶ 24–25;

ECF No. 62-6 ¶¶ 24–25.) Two weeks later, Romero had an orthopedic evaluation with Robin

Gehrmann ("Gehrmann"), who recommended a hinged knee brace, range-of-motion exercises,

and six weeks of physical therapy. (ECF No. 58-2 ¶ 28; ECF No. 62-6 ¶ 28.) Another

orthopedist subsequently also recommended use of a hinged knee brace, but Romero did not

actually receive a hinged knee brace until June 12, 2012. (ECF No. 58-2 ¶ 33; ECF No. 62-6 ¶

33.) Romero did not undergo knee surgery at that time. (*See* ECF No. 58-2 ¶¶ 34–35; ECF No.

62-6 ¶¶ 34–35.)

In May 2014, over four months after this action was commenced, Ahsan requested that

Romero receive another orthopedic consultation. (ECF No. 58-2 ¶ 50–52.) On September 12,

2014, an orthopedist at Cooper Hospital, Dr. Pollard, recommended that Romero be scheduled

for knee surgery. (*See* ECF No. 58-2 ¶¶ 45–48; ECF No. 62-6 ¶¶ 45–48.) Dr. Pollard performed

---

[2] Tertiary care is "specialized consultative care, usually on referral from primary or secondary medical care personnel, by specialists working in a center that has personnel and facilities for special investigation and treatment." *Tertiary medical care*, Stedmans Medical Dictionary 145510 (2014).

ACL-repair surgery on Romero's right knee on October 22, 2014.  (ECF No. 58-2 ¶ 50; ECF No. 62-6 ¶ 50.)

### B.  The Complaint and Procedural History

Meanwhile, on December 19, 2013, Romero, acting *pro se*, filed a Complaint under 42 U.S.C. § 1983 claiming that Ahsan and Gehrmann violated his constitutional rights by deliberately denying him knee surgery and by delaying provision of the hinged knee brace. (ECF No. 1.)  Romero alleged that, the day after his injury, Shakir had told Romero that he would need knee surgery and not to move his knee, but that Ahsan had disregarded this advice, trying to force Romero to stand up and walk at an examination shortly thereafter.  (*Id.* ¶¶ 9–11.) Romero alleged that he had filed a remedy form complaining of Ahsan's insistence that he walk and that, when he told Ahsan that he had filed a grievance, Ahsan "gave him a dirty look and left."  (*Id.* ¶¶ 11–12.)

Romero alleged that, after Shakir had again recommended surgery, Ahsan stated that surgery was needed but told Romero that "patients that file remedy forms do not receive surgeries in my prison."  (*Id.* ¶¶ 13–15.)  Romero asserted that he had then filed another remedy form against Ahsan.  (*Id.*)  Romero alleged that, on January 26, 2012, Shakir had told him that he needed full knee reconstruction, but that, later that day, Ahsan had again told him he would not receive surgery and discharged him from the infirmary.  (*Id.* ¶ 17.)  Romero explained that his existing injuries were still so severe that he required immediate readmittance.  (*Id.*)

Romero alleged that Gehrmann had subsequently "told plaintiff that in fact he needed surgery but things were more complicated than that, but not to worry because his injuries would still be treated in other ways" and also that Gehrmann had "tried to convince the plaintiff that complaining against Ahsan was an exaggerated response because he meant well and is a good

doctor." (*Id.*) The following day, Romero alleged, Ahsan had again told him that "complaining equals no surgery" and had discharged him from the infirmary. (*Id.* ¶ 19.) Romero indicated that he had filed another remedy form against Ahsan and Gehrmann on February 16, 2012, and that, at his next appointment, Gehrmann had again told him there would be no surgery, despite the recommendation of Romero's physical therapist. (*Id.* ¶¶ 20–21.) Romero additionally alleged that his receipt of a hinged knee brace was intentionally delayed "to keep the plaintiff confined to his wheelchair and prolong his pain and suffering, because he filed grievances against [Ahsan and Gehrmann], and to deter him and others from filing grievances." (*Id.* ¶¶ 22–23.)

Romero alleged that Ahsan's and Gehrmann's conduct constituted cruel and unusual punishment under the Eighth Amendment and retaliation under the First Amendment. (*Id.* ¶¶ 27–38.) He sought a declaration that his constitutional rights were violated, an order requiring knee surgery and enjoining further retaliation, and unspecified compensatory and punitive damages, as well as costs and attorney's fees. (*Id.* at ECF pp. 10–12.)

The defendants answered Romero's Complaint, and the parties engaged in fact discovery. The Court granted a motion by Romero for appointment of *pro bono* counsel, and in the wake of counsel's appearance, discovery was reopened. (*See* ECF Nos. 45–51.) Shortly thereafter, Gehrmann was dismissed from the case by way of a stipulation between the parties. (ECF No. 52.)

Once fact discovery had been completed, Ahsan filed a motion for summary judgment in his favor. (ECF No. 58.) He argued that judgment must be granted denying the inadequate-treatment claim because the evidence did not demonstrate either a serious medical condition or that Ahsan was deliberately indifferent to a medical need. (Def.'s Br. in Supp., ECF No. 58-1, at

6–13.)  Ahsan also contended that summary judgment should be granted as to the retaliation claim as there has been no demonstration that Romero engaged in constitutionally protected conduct or that Ahsan took any retaliatory act.  (*Id.* at 14–16.)  Finally, Ahsan argued that the Complaint was barred by the Prisoner Litigation Reform Act of 1995 ("PLRA") as Romero never actually filed any related grievances, and thus failed to exhaust administrative remedies. [3] (*Id.* at 17–18.)  Romero, through counsel, opposed the summary judgment motion, (ECF No. 62), and Ahsan filed a reply brief, (ECF No. 65).

The Court denied Ahsan's motion without prejudice, finding outstanding factual questions related to the exhaustion argument.  (*See* ECF No. 67.)  The primary issue of fact stemmed from Romero's assertions that he had filed five remedy forms concerning Ahsan, and Ahsan's contention that the prison had no record of receiving such grievances.  (*See id.*)  The Court noted that "where a prison's administrative grievance 'procedures d[o] not contemplate an appeal from a non-decision,' the grievance process is unavailable to the complaining inmate after the inmate 'fail[s] to receive . . . a response to the grievances.'"  (*Id.* at 16 (alterations in original) (quoting *Small v. Camden Cty.*, 728 F.3d 265, 273 (3d Cir. 2013)).)  Accordingly, the Court concluded that "if this Court were to find that Plaintiff in fact filed the five grievances concerning Defendant's conduct, and that Plaintiff did not receive responses to those complaints, the Court could find that the IRF grievance process was not legally 'available' to Plaintiff."  (*Id.* at 17.)  Accordingly, I ordered an evidentiary hearing on the issue of exhaustion, and I deferred consideration of the other arguments for summary judgment pending resolution of the exhaustion issue.  (*Id.* at 17–19.)

---

[3]  Ahsan's arguments in support of summary judgment are more fully discussed below.

An evidentiary hearing was held on June 9, 2017.  (*See* ECF Nos. 78 & 86.)  Following the hearing, the litigants took additional depositions and filed supplemental submissions with the Court.  (*See* ECF Nos. 89 & 90.)  The substance of the litigants' supplemental submissions and the testimony adduced during the evidentiary hearing is discussed in the analysis below.

## III.     EXHAUSTION

### A.  The PLRA Exhaustion Requirement

The PLRA provides, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *Ball v. Famiglio*, 726 F.3d 448, 456 (3d Cir. 2013), *abrogated on other grounds by Coleman v. Tollefson*, 135 S. Ct. 1759 (2015).  The exhaustion requirement is mandatory and, thus, bars an inmate from commencing such an action without first properly exhausting available administrative remedies. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 85, 93–94 (2006).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see also Coulston v. Glunt*, 665 F. App'x 128, 132 (3d Cir. 2016).  Exhaustion is a "non-jurisdictional prerequisite" and, consequently, is a "'threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time.'"  *Rinaldi v. United States*, 904 F.3d 257, 265 (3d Cir. 2018) (emphasis omitted) (quoting *Small*, 728 F.3d at 270).

Failure to exhaust administrative remedies is an affirmative defense, which the defendant bears the burden to plead and prove.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Mitchell v. Horn*,

318 F.3d 523, 529 (3d Cir. 2003). "Furthermore, the defendant must prove that the prisoner-plaintiff failed to exhaust *each* of his claims. There is no 'total exhaustion' rule permitting dismissal of an entire action because of one unexhausted claim." *Small*, 728 F.3d at 269 (emphasis added); *see also Jones*, 549 U.S. at 219–24.

An exhaustion defense presents a question of law, to be decided by the judge, even if this requires the resolution of factual disputes. *Small*, 728 F.3d at 269; *see also Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010). Accordingly, "judges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Small*, 728 F.3d at 271.

There is no futility exception to the exhaustion requirement. *See Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000). The PLRA, however, "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. Namely, it requires exhaustion only of "such remedies 'as are available.'" *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002) (quoting 42 U.S.C. § 1997e(a)); *see also Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000). Consequently, a prisoner plaintiff "is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). "The availability of administrative remedies to a prisoner is a question of law." *Mitchell*, 318 F.3d at 529; *see also Ray v. Kertes*, 285 F.3d 287, 291 (3d Cir. 2002). The Supreme Court has identified three types of situations in which purportedly available administrative remedies may nevertheless be considered unavailable: (1) when an administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use," *i.e.*, where "some mechanism exists to provide relief, but no ordinary prisoner can discern or

navigate it"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60; *see also Rinaldi*, 904 F.3d at 266–67.

### B. The Applicable Inmate Remedy System

The litigants have presented the Court with two similar (though not quite identical) potential administrative-remedy frameworks:  one derived from an NJSP inmate handbook and one from the New Jersey Administrative Code.  Romero testified during the evidentiary hearing that he understood that he needed to follow the administrative-remedy procedures set out in the New Jersey State Prison Inmate's Handbook (Revised October 2007) ("the Handbook").  (*See* ECF No. 86 at 23–24.)  Defense witness, Linda Santoro ("Santoro"), who served as the NJSP remedy coordinator from September 2013 to September 2016, also testified that she followed the procedure set forth in the Handbook.  (*Id.* at 84, 93.)

The Handbook lays out a procedure for the submission of an Inmate Request System and Remedy Form ("Remedy Form"), noting that the form must include "the inmate's name, SBI number, institution, housing unit and date of request/complaint" and further emphasizing that "[i]t is important that the information clear [sic], complete and easy to read and understand as possible in order that the problem being addressed be clearly understood."  (Certif. of Surinder K. Aggarwal, Ex. A, ECF No. 90-2, at ECF p. 6.)  The Handbook advises inmates that "[w]hen a form is submitted incorrectly it may be returned to you with a cover form called the Department of Corrections Inmate Request System and Remedy System Corrective Action Form (IRSF 103), which will indicate the actual reason your form is being returned to you."  (*Id.* at ECF p. 7.)  It notes that each form should address only one problem or request and that "[m]ultiple issues submitted on one form will cause you [sic] form ***NOT BE*** [sic] ***PROCESSED***."  (*Id.*)  Inmates

are directed to deposit completed Remedy Forms "into the collection box marked "*INMATE REQUEST FORMS*", located in each Compound," and the Handbook explains that request forms "will be picked up daily." (*Id.*) It further states, "Under normal circumstances the *INMATE REQUEST SYSTEM AND REQUEST FORM* will be processed within thirty (30) working days" and instructs inmates that "[a]dditional forms addressing the same problem or concerns are NOT to be submitted before the end of this 30 day working period, and will not be processed if received." (*Id.* at ECF pp. 7–8.) In a section regarding the appeal process, the Handbook states that an inmate "may appeal a staff response to your Inmate Request System and Remedy Form" and that the appeal must be submitted "within ten (10) days of the date your response is returned to you." (*Id.* at ECF p. 8.)

Alternatively, Ahsan contends that the proper grievance procedures were established by Title 10A, Chapter 1, Subchapter 4, of the Administrative Code ("Subchapter 4"). This subchapter, as it existed in 2012 and 2013, largely laid out the same procedures described in the Handbook. It similarly required inmates to include their name and SBI number and to clearly indicate the nature of the request. N.J. Admin. Code 10A:1-4.4(e) (2008).[4] It also stated that a Corrective Action Form would be returned to inmates who submitted inappropriate or incomplete Remedy Forms to advise them "of the appropriate steps the inmate needs to take in order to address the issue or to process and fully complete the request." § 10A:1-4.4(g) (2008). As in the Handbook, Subchapter 4 directed inmates to place their completed Remedy Forms in "designated collection boxes that are located in specified areas of the correctional facility." § 10A:1-4.4(f) (2008). Regarding time for review, Subchapter 4 stated, "Correctional facility staff

---

[4] All sections of Subchapter 4 were amended in 2015. *See* 47 N.J.R. 1863(a); 47 N.J.R. 3028(a). The text of Subchapter 4, as it was enacted in 2008 and as was still effective in 2012 and 2013, is found at 40 N.J.R. 3718(d).

shall review and respond to a request for information, issue, concern, complaint or problem presented by the inmate in a 'Routine Inmate Request' or 'Interview Request' within 30 calendar days unless the request is determined to be an urgent request or a request is determined to require further deliberation." § 10A:1-4.5(e) (2008). The section regarding appeals stated that "[a]n inmate may appeal a response or finding received after exhausting the initial step of the Inmate Remedy System as indicated in N.J.A.C. 10A:1-4.5 above," and it described how to submit an administrative appeal, "within 10 calendar days from the issuance of the decision or finding of the correctional facility staff member." § 10A:1-4.6(a)–(b) (2008).

Subchapter 4 also included some provisions that are absent from the Handbook. For instance, it stated, "The comprehensive Inmate Remedy System to include a 'Routine Inmate Request' and/or 'Interview Request,' and an 'Administrative Appeal' must be utilized and fully exhausted prior to an inmate filing any legal action regarding information requests, issues, concerns, complaints, or problems." § 10A:1-4.4(d) (2008). It also contained other sections placing a greater emphasis on the prison administration's responsibility to provide inmates timely responses to their requests. For example, it provided that inmates should receive notice within 30 days of their filing if producing a response would take longer than 30 days. § 10A:1-4.4(i) (2008). It also placed responsibility upon the prison administrator and the remedy coordinator for ensuring that inmates received timely responses to their requests. *See* §§ 10A:1-4.7(a)(2), -4.8(a)(4)–(8) (2008).

Romero's understanding, as well as that of various deposed NJSP staff and inmates, appears generally consistent with the guidelines contained in the Handbook. Romero testified during the evidentiary hearing that locked grievance boxes were placed outside of the North and West prison compounds and that inmates could, alternatively, give their completed Remedy

Forms to a prison social worker. (ECF No. 86 at 24–25, 79.) He further testified as to his understanding that the prison generally had 30 days to respond to a Remedy Form. (*Id.* at 62.)

Former remedy coordinator Santoro testified extensively at the hearing as to her understanding of the Handbook's remedy procedures, as well as her general practices. (*See id.* at 82.) Santoro explained that she collected Remedy Forms from the locked boxes in each compound every weekday morning and then "sorted through them, we read through them, and put them in piles as to which department they would have been assigned to." (*Id.* at 88, 94–97.) She explained that after the Remedy Forms were separated by department "they were put in alphabetical order, logged into the computer, and assigned a case number." (*Id.*) She stated, however,

> If there is something wrong with the form, it's returned to the inmate in its entirety along with a corrective action form indicating what the problem is. Like if there was more than one question, or there was something that required a form and not a remedy form, it would have been sent back to the inmate notifying him how to correct the remedy form for submission.

(*Id.* at 96–98.) Santoro noted that defective forms returned to the inmate were not logged in database, that she did not retain a copy of defective forms, and that there would be no record of the form having been submitted. (*Id.* at 97–99.) Santoro denied ever destroying or disregarding any Remedy Form and stated that all Remedy Forms received would be either logged and sent to the proper department or returned to the inmate with a corrective action form. (*Id.*)

Santoro recounted,

> As [Remedy Forms] came back from the departments completed -- the inmate asks the question, the person from the department signs it, the supervisor signs the answer to the inmate's question. Then it comes back to us, to administration. . . . . At the end of that period, the inmate would get through regular mail his yellow copy with the department's response.

(*Id.* at 89.)  Asked whether she had any method for keeping track of Remedy Forms that were due for a response, Santoro explained that "the [prison] administrator took a daily count of what was outstanding and what came in."  (*Id.* at 90–91.)  Santoro also confirmed that Remedy Forms would not be accepted, and would be returned to the inmate for corrective action, if the inmate had submitted a form raising the same question or issue within the prior 30 days.  (*Id.* at 104–06.)  Santoro stated that if NJSP staff failed to respond to a Remedy Form within the prescribed 30 days, the proper procedure was for the inmate to file another Remedy Form.  (*Id.* at 106–07.)  She explained,

> So now the exhaustion is, if we receive it and we log it in on February the 4th, March the 4th he doesn't get an answer, that is also considered part of exhausting the remedies because he did not receive a response to the February 4th request.  So there is two ways he can exhaust, not receiving any response within 30 days and also after his appeal.

(*Id.*)  Thus, Santoro testified that a Remedy Form that produced no response from the prison was "not exhausted" if the inmate did not submit a second Remedy Form complaining about the failure to respond.  (*Id.* at 107.)

Santoro additionally noted that requests for medical treatment were not considered a proper issue for a Remedy Form and should instead have been made by way of the medical department's request-for-treatment form.  (*See id.* at 109.)  Santoro testified that if she received a Remedy Form seeking medical treatment she "would send it to medical, and let them make a decision whether they need the inmate to fill out a form or not."  (*Id.* at 109–10.)  If the medical department stated that the inmate needed to submit a request for treatment, Santoro stated she "would mark it in our database, that it was returned to the inmate on such and such a date with a response from medical."  (*Id.* at 110.)

Santoro testified that the only explanation for a properly submitted Remedy Form that does not appear in the database is that it was returned to the inmate with a corrective action form. (*Id.* at 113, 116–17.) Santoro confirmed that it was possible that her office may have neglected to enter a date for the return of a remedy response to an inmate, but emphasized that she would not have permitted a proper Remedy Form to go unrecorded. (*See id.* at 121–27.) She admitted, however, that she did not know how Remedy Forms were handled in 2012. (*Id.* at 127.) Importantly, Santoro conceded that she had received an unspecified number of Remedy Forms in 2013 and 2014 raising complaints that Remedy Forms were "being lost or misplaced." (*Id.* at 139.)

The parties also took the deposition of George Byrd ("Byrd"), who served as the NJSP remedy coordinator from to August 2011 until April 2012. (Certif. of Surinder K. Aggarwal, ECF No. 90-4, Ex. E, Tr. of Dep. of George Byrd (Dec. 6, 2017), at 8.) Byrd described the inmate remedy system as follows:

> Well, there is an inmate remedy forms [sic] that are given to the prisoners, if they have a problem or a grievance, or they want something explained. All of these remedy forms go into a box, generally white boxes as I recall, and on a daily basis I would go down and get the remedy forms and look at them and figure out who is going to do what. Sometimes I would do it, if it was an open case, I'd give the inmate back the open form. If it was sometimes in like food service, I am familiar with the Food Service Supervisor I would ask him. Otherwise, I would give it to whatever area that was required to be answered. I would get it back and take it back to the inmate.

(*Id.*) Unlike Santoro, Byrd, who was remedy coordinator during the period when Romero claims to have filed his first three Remedy Forms, testified that he did not recall using any log or spreadsheet to keep track of the Remedy Forms he received. (*Id.* at 12.) In response to the question, "[H]ow was it that you tracked the remedy forms that were being collected?," Byrd

responded, "I didn't." (*Id.* at 12–13; *see also id.* at 33–34.)  Byrd also stated that an inmate who

did not receive a response to a Remedy Form would raise the issue by submitting another

Remedy Form.  (*Id.* at 17.)

Jose Ramos, an inmate paralegal who apparently helped Romero prepare two inmate

Remedy Forms, also testified as to his understanding of the inmate remedy system.  (Certif. of

Surinder K. Aggarwal, ECF No. 90-4, Ex. D, Tr. of Dep. of Jose Ramos (July 27, 2017).)

Regarding the system as it existed in 2012, he testified:

> Around that time it was like remedy forms, and you will type it in
> or write it in what it is that you are complaining about and send it
> in to the administration, you will keep a copy for yourself, and then
> send the original to the administration and let them know.
> * * * *
> You would put it in a box where they got a specific box where it
> says remedies.  And you just -- when you go to the mess hall or
> even you can give it to the officer, you know, like or mail it in to
> the institutional channels, you can either do it like that too.
> * * * *
> [W]hen you walk around with like to go to the mess hall, they got
> a remedy box where you use to put the remedies in there, or going
> to the law library, they had a box where you can put it in there, or
> you coming up from the north compound or the south compound,
> they got their own boxes.  Usually outside the wings is where they
> keep them.

(*Id.* at 13.)[5]

### C.  Evidence Regarding Romero's Submission of Remedy Forms

In his Complaint, Romero alleges that he filed three different Remedy Forms concerning

Ahsan:  (1) in response to Ahsan's directing him to walk, in contradiction of Shakir's

instructions, on January 6, 2012; (2) in response to Ahsan telling him that "patients that file

---

[5]  The parties submitted additional affidavits from other staff members and inmates discussing
how the remedy system operated.  *See* Certif. of Surinder K. Aggarwal, Ex. F. Tr. of Dep. of
Richard Pulcino (July 23, 2015), ECF No. 62-3, at ECF pp. 17–18; *Id.*, Ex. M., Tr. of Dep. of
Margaret Reed (Apr. 15, 2016), ECF No. 62-4 at ECF pp. 14–15.  Their understandings of the
remedy system are consistent with the testimony already summarized here.

remedy forms do not receive surgeries in my prison" on January 13, 2012; and (3) on February 16, 2012, against both Ahsan and Gehrmann, after Ahsan again told him that because Romero complained he would not receive surgery. (ECF No. 1 ¶¶ 11, 15, 20.) Romero also referenced these Remedy Forms in his deposition testimony, as well as a Remedy Form he filed on May 20, 2012, complaining about delays in receiving surgery or a knee brace and a similar Remedy Form he filed on September 24, 2013. (*See* ECF No. 62-2 at ECF pp. 39, 50–53.)

At the outset of the evidentiary hearing, the litigants submitted a stipulation reading,

> The DOC database does not show the entry of any remedy forms, or grievances submitted by Michael Romero that are the subject of this hearing. Specifically, those claims have been submitted on or about January 6, 2012, January 14, 2012, February 16th, 2012, May 20, 2012, and September 24, 2013.

(ECF No. 86 at 4.)

During the hearing, however, Romero testified to these five Remedy Forms in greater detail. He identified a Remedy Form, introduced as an exhibit, as the first grievance against Ahsan, explaining that he wrote out the grievance while he was in the infirmary and had Ramos, an inmate paralegal, type it for him. (ECF No. 86 at 8–12.) Romero testified that he gave the grievance to Ramos on January 6, 2012, that Ramos returned it to him within "a couple of days," and that Romero then submitted the Remedy Form in a grievance box on his way to Catholic services. (*Id.* at 11–21, 25.) The pertinent exhibit is a copy of Romero's Remedy Form bearing a date of January 6, 2012. (Certif. of Surinder K. Aggarwal, Ex. B, ECF No. 90-2, at ECF p. 10.) It reads,

> Despite my severe knee injuries which prevent me from walking, and the orthopedist's orders not to force my knee, Dr. Abu Ahsan keeps directing me to walk every time he comes to check on me at the infirmary. He is being indifferent to my pain, suffering, and inability to comply with his requests. Dr. Ahsan's actions violate

my state and federal constitutional rights.  Therefore, today I
refused to try to walk when directed to do so by Dr. Ahsan.

(*Id.*)  The remaining portions of the form (for staff responses and any subsequent appeal) are

blank.  (*See id.*)

Romero identified another Remedy Form as the second he filed against Ahsan.  (ECF No.

86 at 21.)  Romero testified that he gave Ramos a handwritten version of this grievance on

January 14, 2012, and that Ramos thereafter returned a typed version.  (*Id.*)  Romero testified

that he submitted this Remedy Form within the next couple of days or the next time he was

allowed to make a "movement" within the prison.  (*Id.* at 21–22, 25; *see also id.* at 12–18.)  The

relevant exhibit is dated January 14, 2012, and reads,

> Yesterday, I was [a]dvised by nurse Milroy and Dr. Ahsan that
> indeed I need reconstructive knee surgery.  But Dr. Ahsan told me
> that patients who file remedy forms do not receive surgeries.  Dr.
> Ahsan is trying to deny me surgery because I filed a remedy form
> against him on 1/6/12.  His retaliatory actions violate my state and
> federal constitutional rights.

(ECF No. 90-2 at ECF p. 11.)  As with the first Remedy Form, the remaining portions of the

form are blank.  (*See id.*)  Romero testified that he never received any response to either the first

or the second Remedy Form.  (ECF No. 86 at 27–28.)  He further testified that he had the copies

that were introduced as exhibits because Ramos provided him "several copies" of the Remedy

Forms when he returned the typed versions.  (*Id.* at 30–32.)

Romero then proffered a copy of the third Remedy Form in question, against Ahsan and

Gehrmann.  (*Id.* at 32–33.)  He testified that, as he had then left the infirmary and had access to

his word processor, he typed this Remedy Form himself on February 16, 2012, had a photocopy

made, and submitted it during the next movement.  (*Id.* at 32–40.)  This Remedy Form, dated

February 16, 2012, reads, "Dr. Ahsan and Dr. Gehrmann are retaliating against me by refusing to

provide me with a knee surgery, prescribed by orthopedist Shakir, because I filed remedy forms against Dr. Ahsan. Both doctors are violating my state and federal constitutional rights." (ECF No. 90-2 at ECF p. 12.) Romero testified that he never received any response to this Remedy Form. (ECF No. 86 at 41.)

Romero identified his fourth Remedy Form, again against Ahsan and Gehrmann, and explained that he typed it himself on May 20, 2012, made a photocopy that evening, and submitted it the next day, on his way either to or from breakfast. (*Id.* at 42–44, 50.) That Remedy Form, dated May 20, 2012, reads,

> Despite the fact that a specialist prescribed me a hinged knee brace and knee surgery in January, to date I haven't received such medical treatments. Dr. Ahsan and Dr. Gehrmann are maliciously delaying the brace, and refusing to allow me to have surgery, to keep me in the wheelchair and prolong my pain as punishment because I filed remedy forms. My previous remedy forms and letter to Ms. Trillo have been ignored. The pain medications have not worked, neither did the physical therapy. Please, I need help: I'm in a lot of pain.

(ECF No. 90-2 at ECF p. 13.) Romero additionally explained that he had photocopies of the third and fourth Remedy Forms by going to the Inmate Legal Assistance ("ILA") office and that one of the staff members there made copies for him without charge. (ECF No. 86 at 44–50.)

Next, Romero identified his fifth and final Remedy Form. (*Id.* at 50–51.) He explained that he typed up the grievance himself on September 24, 2013, because he was still "going back and forth with Dr. Ahsan" regarding the hinged knee brace and surgery. (*Id.* at 51–52.) Romero testified that he went to the ILA office the following day to have a photocopy made, for which he was not charged, and then submitted the Remedy Form the same day on his way to "chow," around lunchtime. (*Id.* at 52–58.) This Remedy Form, dated September 24, 2013, reads,

> Dr. Ahsan and Dr. Gehrmann keep refusing to allow me to have knee surgery, which was prescribed by orthopedist surgeon Shakir

> in January 2012, regardless of them knowing that the physical
> therapy, pain medication, and hinged knee brace have not helped
> with my extreme pain and that I'm losing function of my right
> knee. They are doing this to castigate me because I filed remedy
> forms. If I don't receive assistance to resolve this matter soon, I'll
> be forced to seek legal help.

(ECF No. 90-2 at ECF p. 14.) Romero testified that he never received a response to any of the

Remedy Forms discussed herein. (ECF No. 86 at 63.) Upon cross examination, Romero

confirmed that he had no recollection of ever submitting a Remedy Form specifically

complaining of the fact that he had not received responses to his prior Remedy Forms. (*Id.* at

71–72.)

Romero's testimony is partially corroborated by the deposition testimony of the inmate

paralegal Ramos. Ramos testified that he recalled meeting Romero in the infirmary "somewhere

around 2011 or 2012," and that Romero asked him once or twice to type a Remedy Form for

him. (ECF No. 90-4, Ex. D, at 18–20.) After being shown copies of the January 6, 2012 and

January 14, 2012 Remedy Forms, Ramos answered affirmatively to the question, "Are you these

[sic] the remedy system forms that you assisted Michael Romero in preparing?" (*Id.* at 20.)

Ramos further explained, "Michael Romero asked me what he wanted done and wrote it on a

piece of scrap paper for me and he said: Could you please type this for me? . . . . That's exactly

what I did, I typed these remedy forms for him." (*Id.* at 20.) Ramos stated that he typed up each

of the Remedy Forms and gave them back to Romero, along with an extra copy, a day or two

after Romero gave him the handwritten version. (*Id.* at 20–21, 23–24.) Ramos stated that he had

no knowledge whether Romero had in fact submitted the typed Remedy Forms. (*Id.* at 26.)

Among other things, Ramos explained that inmates could generally get photocopies made by

going to the law library or by asking a paralegal for a copy. (*Id.* at 16–17.) He also explained

that when an inmate asked him to type a document that he would typically give them "an extra

copy for their file" if it is only one page, but that obtaining a copy of a longer document would involve paperwork and a copying charge. (*Id.* at 17–18.)

At deposition, Ahsan testified that he would typically review grievances against him in order to formulate a response. (Declaration of Margaret Raymond-Flood, ECF No. 58-4, Ex. C, Tr. of Dep. of Abu Ahsan (Feb. 24, 2016), at 98.) Ahsan further asserted that he had no knowledge of Romero filing any Remedy Forms against him and that he had never seen any of the Remedy Forms Romero claims to have filed regarding his medical treatment. (*Id.* at 99–100.)

For the defense, Santoro, addressing the question why, if a Remedy Form was deposited in the collection box, there could be no record in the DOC database, stated that "[t]he only explanation is it was sent back with a corrective action and wasn't tracked." (ECF No. 86 at 113; *see also id.* at 116–17.) Acknowledging that she typically processed 900 Remedy Forms each month, she stated, "Sometimes they would slip through, but they would always be logged in if we processed them." (*Id.* at 114.) Santoro stated that, to her knowledge, it was not possible for an inmate to get a copy of a document without paying. (*Id.* at 115.) Santoro noted that the database indicated 17 Remedy Forms filed by Romero between 2009 and 2016, and stated that the only explanation for the database not reflecting the Remedy Forms against Ahsan and Gehrmann was that "[t]hey weren't processed." (*Id.* at 118.) Santoro agreed with the characterization that "occasionally something may slip through the cracks[;] You may not log something in that should have been[;] Mistakes are made." (*Id.* at 125.) Nevertheless, she agreed with the statement that, while she was remedy coordinator, "every single grievance" was either "entered into the computer system or [was] sent back with the corrective action form." (*Id.* at 125–27.)

Byrd, who was the remedy coordinator during the period when Romero claims to have submitted his first three Remedy Forms concerning Ahsan, stated that he did not recall any system for tracking received Remedy Forms.  (ECF No. 90-4, Ex. E, at 12–13.)  He further testified that he had no recollection of any Remedy Forms filed by Romero or of meeting Romero.  (*Id.* at 17.)  Byrd admitted that it was "theoretically possible that [he] could have received a form, submitted it to the appropriate department, but never received that form back from that department," and that he had no way of tracking Remedy Forms.  (*Id.* at 33–34.)

Margaret Reed ("Reed"), a staff member of University Correctional Healthcare, who described her duties as "report[ing] on all of the complaints related to medical care, mental health care, and dental care," testified at deposition that she could access "the database that the DOC keeps where they log in every grievance" and that there were no grievances from Romero regarding medical care.  (Declaration of Margaret Raymond-Flood, ECF No. 58-4, Ex. D, Tr. of Dep. of Margaret Reed, at 10.)  The parties, apparently, were unable to obtain any testimony from Randee Jolly, who served as remedy coordinator between Byrd and Santoro.  (*See* ECF No. 86 at 167–68.)

### D.  Exhaustion Analysis

Determining whether Romero's claims should be barred for failure to exhaust administrative remedies requires the resolution of two distinct questions:  (1) pursuant to the PLRA and the Inmate Remedy System then in effect, what steps did Romero need to take in order to exhaust available administrative remedies and (2) did Ahsan meet his burden of demonstrating that Romero did not, in fact, take the steps necessary for exhaustion.  Addressing the first question, the Inmate Remedy System that was effective in 2012 and 2013 contemplated two stages of the grievance process:  an initial filing and, if the inmate is unsatisfied with the

response to the initial filing, an administrative appeal. *See* N.J. Admin. Code § 10A:1-4.4 through -4.6 (2008). (*See also* ECF No. 90-2 at ECF pp. 6–8.) Indeed, a section of the Administrative Code stated that the process, including the initial filing and the appeal, "must be utilized and fully exhausted prior to an inmate filing any legal action." § 10A:1-4.4(d) (2008). It is undisputed that Romero did not file any administrative appeals concerning any of the issues in this action.

Instead, Romero contends that he exhausted his available administrative remedies by filing five initial Remedy Forms, to which he never received any response. (*See* ECF No. 90 at 4–9.) Indeed, although the Inmate Remedy System ostensibly required the prison administration to respond to a Remedy Form within 30 days (or to notify the inmate that further time would be required to generate a response), neither the Administrative Code nor the Handbook provide any mechanism for an inmate whose initial Remedy Form has gone unanswered to appeal or otherwise complain about the lack of a response. *See* N.J. Admin. Code §§ 10A:1-4.1 through -4.9 (2008). (*See also* ECF No. 90-2 at ECF pp. 6–8.)

The "Purpose" section of the Administrative Code noted that "[t]he Inmate Remedy System also includes an 'Administrative Appeal' through which inmates are encouraged to formally appeal to the Administrator or designee the decision or finding rendered by correctional facility staff in regard to the 'Routine Inmate Request' or 'Interview Request' . . . ." N.J. Admin. Code § 10A:1-4.1(a)(1) (2008). Section 4.4 described the availability of an administrative appeal "in response to the resulting decision or finding," and further stated that "when a 'Routine Inmate Request' or 'Interview Request' decision is rendered by correctional facility staff to the inmate, and the inmate wishes to appeal *the resulting decision or finding* to the Administrator or designee, the inmate is encouraged to submit an 'Administrative Appeal.'" § 10A:1-4.4(c)

(2008) (emphasis added).  The appeal section similarly stated, "An inmate may appeal *a response or finding* received after exhausting the initial step of the Inmate Remedy System . . . ." § 10A:1-4.6(a) (2008) (emphasis added).  That section set the deadline for filing an appeal as "within 10 calendar days from *the issuance of the decision or finding* of the correctional facility staff member."  § 10A:1-4.6(b) (2008) (emphasis added).  Likewise, the Handbook informs an inmate that "[y]ou may appeal a *staff response* to your Inmate Request System and Remedy Form" and states that appeals must be filed "within ten (10) days of the date *your response is returned* to you."  (ECF No. 90-2 at ECF p. 8 (emphasis added).)

This language makes clear that there was no mechanism in place during the relevant timeframe for an inmate to file an administrative appeal if there was no staff response to the initial Remedy Form.  Each relevant section of the Handbook or the Administrative Code refers to an appeal of a decision, a response, or a finding—not an appeal of a non-response.  *See* N.J. Admin. Code §§ 10A:1-4.1, -4.4, -4.6 (2008).  (*See also* ECF No. 90-2 at ECF p. 8.)  Even if, hypothetically, inmates were permitted to appeal from non-responses to Remedy Forms, there would be no clear deadline to do so, as the ten-day period to file an appeal begins to run upon the issuance or return of the response to the initial grievance.

The NJSP staff who have testified regarding this matter have not even suggested that an inmate could have filed an administrative appeal regarding an initial grievance for which no response was provided.  Instead, both Santoro and Byrd stated that the proper course of action for an inmate who received no response to a Remedy Form was to file another Remedy Form. (ECF No. 86 at 106–07; ECF No. 90-4, Ex. E at 17.)  Santoro even testified that proper exhaustion required filing a second Remedy Form if the first one failed to produce a response. (ECF No. 86 at 107.)  As there is no part of the Administrative Code or Handbook that mentions

such a procedure, however, the Court declines to find, as a matter of law, that exhausting administrative remedies under the Inmate Remedy System effective in 2012 and 2013 required inmates to file follow-up Remedy Forms when they did not receive responses to their initial ones.

Therefore, while the Administrative Code facially appears to have imposed a requirement that inmates file an administrative appeal before their claims could be considered administratively exhausted, I find that, if Romero in fact filed the Remedy Forms he claims to have and received no response, the putative remedy of administrative appeal was not available for the purposes of the PLRA. As it does not appear that there was any way for Romero to file an administrative appeal of a non-response, a failure by the prison to process or respond to Remedy Forms would render the potential administrative appeal a dead end or would indicate that prison staff were thwarting such avenues for relief. *See Ross*, 136 S. Ct. at 1859–60.

This finding is consistent with the analysis of the Court of Appeals for the Third Circuit in *Small v. Camden County*, 728 F.3d 265 (3d Cir. 2013). There, as in this case, the inmate plaintiff contended that he had filed grievances, but had not received any response or decision regarding those grievances, and thus had filed no administrative appeal. *Id.* at 273. The administrative-remedy system considered in *Small* is not meaningfully distinguishable from the one that was effective in NJSP in 2012 and 2013. *See id.* at 274–75. The district court in *Small* had found that some of Small's claims were unexhausted because he had not filed any administrative appeal following grievances that produced no response. *See id.* at 273. The Third Circuit reversed, finding, because the procedures "discuss[ed] only the appeal of a *decision* with which the inmate is not satisfied," that the district court's analysis "erroneously read an additional requirement into [the] grievance procedures." *Id.* That court further explained,

"Because [the grievance] procedures did not contemplate an appeal from a non-decision, when Small failed to receive even a response to the grievances . . . , much less a decision as to those grievances, the appeals process was unavailable to him." *Id.* The Third Circuit reconfirmed this principle three years later, in *Robinson v. Superintendent Rockview SCI*, 831 F.3d 148 (3d Cir. 2016), holding that a prison had "rendered its administrative remedies unavailable to [the plaintiff] when it failed to timely (by its own procedural rules) respond to his grievance and then repeatedly ignored his follow-up requests for a decision on his claim." *Id.* at 154; *see also Jackson v. Gandy*, Civ. No. 09-1141 (AMD), 2017 WL 3293482, at *4, *7 (D.N.J. Aug. 1, 2017) (finding administrative appeal unavailable in circumstances virtually identical to those herein). These precedents confirm this Court's holding in its prior opinion, that "if this Court were to find that Plaintiff in fact filed the five grievances concerning Defendant's conduct, and that Plaintiff did not receive responses to those complaints, the Court could find that the IRF grievance process was not legally 'available' to Plaintiff, excusing his failure to exhaust administrative remedies." (ECF No. 67 at 17.)

This brings the Court to an assessment of the relevant factual question: whether Ahsan has met his burden of showing that Romero did not, in fact, file Remedy Forms concerning the claims advanced in this action. Romero testified credibly and in detail, at the evidentiary hearing before this Court, as to the circumstances of the preparation and submission of five Remedy Forms concerning Ahsan. (*See* ECF No. 86 at 8–58.) He has presented his reasons for preparing the Remedy Forms, explained how he went about typing them or having them typed for him, and identified when and how he submitted them. (*See* ECF No. 86 at 8–58.) Romero has also submitted photocopies of the five Remedy Forms he allegedly filed and explained the circumstances of obtaining these copies. (*See* ECF No. 86 at 8–58; ECF No. 90-2, Ex. B.) The

circumstances of the creation of the first two Remedy Forms and the additional copies of those forms has been corroborated by the testimony of Ramos, the inmate paralegal who testified that he typed those forms for Romero while Romero was confined to the infirmary in January 2012. (*See* ECF No. 90-4, Ex. D at 18–24.)

In an attempt to prove that Romero did not properly submit those five Remedy Forms, Ahsan has presented testimony from NJSP and hospital staff who are able to state only that they have no record or recollection of Romero filing such forms. Byrd, who was the remedy coordinator during the period when Romero allegedly filed his first three Remedy Forms, testified only that he did not recall any grievances from Romero, but admitted that he had no system of tracking received Remedy Forms and that it was possible that Romero could have filed a Remedy Form and never received a response from the proper department. (ECF No. 90-4, Ex. E at 12–17, 33–34.) There has been no testimony or statement introduced from Randee Jolly, who served as the remedy coordinator when Romero claims to have submitted his fourth Remedy Form. At best, Santoro, who was the remedy coordinator when Romero allegedly submitted his fifth and final Remedy Form, testified that when she was remedy coordinator all Remedy Forms were either logged into a database before being relayed to the proper department or were returned to the inmate as defective. (*See* ECF No. 86 at 113–18, 125–27.) Even she, however, admitted that things sometime "slip through the cracks" and that "[m]istakes are made." (*Id.* at 125.)

Given this record, the Court finds that Ahsan has not met his burden of showing that Romero failed to exhaust his remedies. *See Jones*, 549 U.S. at 216. Byrd's testimony that he does not recall receiving Remedy Forms from Romero, and the lack of testimony from Jolly, is not sufficient to overcome Romero's detailed testimony, partially corroborated by Ramos,

regarding the preparation and submission of the first four Remedy Forms in 2012.  Although the parties have stipulated to the fact that no record of Romero's Remedy Forms appears in the prison database, this fact is not probative in light of Byrd's testimony that he did not recall using any database to log Remedy Forms and in fact had no way of tracking what forms had been received.  Santoro's detailed testimony regarding her methods of logging and processing inmate Remedy Forms comes closer to showing a lack of exhaustion, but this generalized testimony as to standard practices is still insufficient to rebut Romero's specific, credible testimony, particularly considering the possibility that the one Remedy Form allegedly filed while Santoro was coordinator could have "slipped through the cracks."  Even were Ahsan to have proven that Romero did not properly file or exhaust the fifth Remedy Form, the claim in that Remedy Form was essentially the same as the claim raised in his prior two Remedy Forms, and, therefore, this claim could be considered exhausted either way.

Thus, the Court finds that Ahsan has not shown that Romero's claims are barred by a failure to exhaust administrative remedies.  Weighing the evidence, the Court finds that Romero submitted his five Remedy Forms as he has alleged and that he received no response to any of them.  The Court further finds that, while the applicable Inmate Remedy System contemplated an appellate step in exhausting administrative remedies, in this case, the lack of a response to any Remedy Form made the option of an administrative appeal unavailable to Romero.  Accordingly, his claims may proceed as exhausted.

## IV.    REINSTITUTED SUMMARY JUDGMENT MOTION

Next, the Court considers the merits of Romero's claims on the parties' prior briefing. (*See* ECF Nos. 58, 62, 65.)  Ahsan argues that summary judgment should be granted on Romero's inadequate-treatment claim because he has failed to show that he suffered a serious

medical condition or that he was subjected to deliberate indifference.  (ECF No. 58-1 at 6–13.)

Regarding Romero's First Amendment retaliation claim, Ahsan argues that Romero has failed to

show that he engaged in constitutionally protected conduct or that he suffered a retaliatory act by

Ahsan.[6]  (*Id.* at 14–16.)

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 permits a court to award a party summary judgment

only if "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is genuine

if supported by evidence such that a reasonable jury could return a verdict in the non-movant's

favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 251–52 (1986); *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Kaucher v. County of Bucks*, 455

F.3d 418, 422–23 (3d Cir. 2006).  A fact is material if, under the governing substantive law, a

dispute about the fact might affect the outcome of the suit.  *See Anderson*, 477 U.S. at 248;

*Kaucher*, 455 F.3d at 423.  In determining whether a genuine dispute of material fact exists, the

court must view the facts and all reasonable inferences drawn from those facts "in the light most

favorable to the [non-movant]."  *Matsushita*, 475 U.S. at 587.

A movant for summary judgment "bears the initial responsibility of informing the district

court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  While a

defendant moving for summary judgment must support assertions by "citing to particular parts of

materials in the record," Fed. R. Civ. P. 56(c)(1)(A), the movant is not required to "support its

motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex Corp.*,

477 U.S. at 323.  Instead, "the burden on the moving party may be discharged by 'showing'—

---

[6] Ahsan's arguments are recounted in greater detail in the legal analysis below.

that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the movant has shown an absence of material factual dispute, the non-movant then bears the burden to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). Moreover, the non-movant may not rest upon the mere allegations or denials of the pleadings. *Id.* at 324; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994), *aff'd* 67 F.3d 291 (3d Cir. 1995). The non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A mere "scintilla of evidence . . . will be insufficient." *Anderson*, 477 U.S. at 252.

## B. Section 1983 Generally

42 U.S.C. § 1983 is the statutory basis for asserting violations of a plaintiff's constitutional rights. That section provides,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States, and second, that the alleged deprivation was committed or caused by a person acting under color of state law. *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

## C. Inadequate Treatment Standard

An incarcerated plaintiff asserting a § 1983 claim for inadequate medical care under the Eighth Amendment must show the existence of a serious medical need and that facility staff demonstrated deliberate indifference to that medical need. *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017); *Mattern v. City of Sea Isle*, 657 F. App'x 134, 138 (3d Cir. 2016); *Giles v. Kearney*, 571 F.3d 318, 330 (3d Cir. 2009). The Third Circuit has stated that "a medical need is 'serious' for purposes of a denial of medical care claim if it is either 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Mattern*, 657 F. App'x at 139 (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)).

A finding of deliberate indifference requires demonstrating that the defendant had the requisite state of mind, *i.e.*, knowledge of a serious medical risk and disregard for that risk. *See Parkell v. Danberg*, 833 F.3d 313, 335, 337 (3d Cir. 2016); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (finding that an Eighth Amendment violation requires a showing of "obduracy and wantonness"); *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (equating deliberate indifference with at least "reckless[] disregard [for] a substantial risk of serious harm."). Courts distinguish "'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Pearson*, 850 F.3d at 538 (quoting *United States ex rel. Walker v. Fayette Cty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)). When the plaintiff received some medical care, the court will presume that the care was proper in the absence of evidence that it fell short of professional norms. *Id.* Thus, "the deliberate indifference standard 'affords considerable latitude to prison medical authorities in the diagnosis and treatment of the

medical problems of inmate patients . . . ." *Pearson*, 850 F.3d at 538; *see also Palakovic*, 854 F.3d at 227; *Parkell*, 833 F.3d at 337.

The Third Circuit has identified a variety of forms that deliberate indifference may commonly take, including: "'where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment.'" *Parkell*, 833 F.3d at 337 (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)); *see also Natale*, 318 F.3d at 582. A mere "inadvertent failure to provide adequate medical care"—*i.e.*, negligent diagnosis or treatment—will not create an Eighth Amendment claim. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Parkell*, 833 F.3d at 337.

### D. Inadequate Treatment Analysis

The relevant, uncontested facts before this Court are as follows:

- Romero sustained injuries to the tendons and ligaments of his right knee on December 28, 2011, (ECF No. 58-2 ¶ 1; ECF No. 62-6 ¶ 1);

- Ahsan examined Romero the same day and, noting swelling and limited range of motion, prescribed a pain reliever and crutches; Ahsan also admitted Romero to the infirmary and ordered an x-ray and orthopedic consultation, (ECF No. 58-2 ¶ 5; ECF No. 62-6 ¶ 5);

- Following an x-ray on December 29, 2011, Ahsan diagnosed Romero as suffering an acute knee sprain with possible ligamentous injury, ordered an MRI scan of Romero's knee, and prescribed infirmary care, range-of-motion exercises, and weight bearing as tolerated, (ECF No. 58-2 ¶¶ 6–9; ECF No. 62-6 ¶¶ 6–9);

- At a January 4, 2012 examination, Ahsan prescribed crutches, range-of-motion

    exercises, pain medication, and continued infirmary care, (ECF No. 58-2 ¶ 11; ECF No.

    62-6 ¶ 11);

- Ahsan saw Romero again on January 6, 2012, and Romero advised that his range of

    motion had improved, (ECF No. 58-2 ¶ 13; ECF No. 62-6 ¶ 13);

- After Romero complained of pain awaking him in the night, Ahsan modified Romero's

    pain medication prescription on January 9, 2012, (ECF No. 58-2 ¶ 14; ECF No. 62-6 ¶

    14);

- Romero underwent an MRI scan on January 11, 2012, which revealed "[s]evere

    apparent posttraumatic findings including complete ACL tear, kissing medial

    compartment contusions, as well as severe disruption of lateral stabilizing structures,"

    (ECF No. 58-2 ¶ 15; ECF No. 62-6 ¶ 15);

- The following day, Ahsan saw Romero again and diagnosed an acute right knee sprain

    with a complete tear of the ACL, medial meniscal tear, and lateral ligament tear; Ahsan

    ordered an orthopedic consultation "ASAP for likely surgery," (ECF No. 58-2 ¶¶ 17–

    18; ECF No. 62-5 ¶ 10; ECF No. 62-6 ¶¶ 17–18; ECF No. 65-2 ¶ 10);

- After an orthopedic consultation, a treatment plan was proposed, including a knee

    immobilizer for two weeks, followed by a hinged knee brace for three months,[7] (ECF

    No. 58-2 ¶ 19; ECF No. 62-6 ¶ 19);

---

[7] The parties disagree over whether, at this point, the plan included potential surgery or whether
Ahsan had already told Romero he would not receive surgery. (*See* ECF No. 58-2 ¶ 19; ECF No.
62-6 ¶ 19.)

- On January 18, 2012, Romero received the knee immobilizer and Ahsan ordered continuing infirmary care and pain medication, (ECF No. 58-2 ¶ 20; ECF No. 62-6 ¶ 20);

- By January 24, 2012, Romero was able to bear some weight on his right leg and could "go to the shower walking with crutches," (ECF No. 58-2 ¶ 22; ECF No. 62-6 ¶ 22);

- A few days later,[8] Romero had an orthopedic consultation with Shakir, who recommended surgery to reconstruct the ACL and the PCL; Shakir would not do the surgery himself, but recommended that Romero be sent to a tertiary care center for evaluation, (ECF No. 58-2 ¶¶ 24–25; ECF No. 62-6 ¶¶ 24–25);

- Thereafter, Ahsan ordered that Romero be sent to University Hospital for an evaluation, (ECF No. 58-2 ¶ 26; ECF No. 62-6 ¶ 26);

- Ahsan saw Romero on February 9, 2012 regarding foot pain and then continued Romero's pain medication and advised Romero to use crutches at all times, (ECF No. 58-2 ¶ 27; ECF No. 62-6 ¶ 27);

- On February 13, 2012, Romero underwent an orthopedic evaluation by Gehrmann, who recommended a hinged knee brace, range-of-motion exercises, and six weeks of physical therapy, (ECF No. 58-2 ¶ 28; ECF No. 62-6 ¶ 28);

- Ahsan ordered a hinged knee brace the following day, (ECF No. 58-2 ¶ 29; ECF No. 62-6 ¶ 29);

- Romero "understood that he needed to strengthen his right knee before undergoing surgery" and "did not object to the proposed plan of treatment," (ECF No. 58-2 ¶ 30; ECF No. 62-6 ¶ 30; *see also* ECF No. 58-2 ¶ 32; ECF No. 62-6 ¶ 32);

---

[8] Ahsan contends that this consultation occurred on January 28, 2012, while Romero contends it occurred on January 26, 2012.  (*See* ECF No. 58-2 ¶ 24; ECF No. 62-6 ¶ 24.)

- Romero commenced physical therapy with Charles Miller ("Miller") at the beginning of March 2012, (ECF No. 58-2 ¶ 31; ECF No. 62-6 ¶ 31; *see also* ECF No. 62-5 ¶ 22; ECF No. 65-2 ¶ 22);

- Romero was seen by another orthopedist on March 27, 2012, who again recommended a hinged knee brace, (ECF No. 58-2 ¶ 33; ECF No. 62-6 ¶ 33);

- Upon his discharge from physical therapy on May 11, 2012, Miller opined that surgery might be required, (*see* ECF No. 62-5 ¶ 23; ECF No. 65-2 ¶ 23);

- Romero received a hinged knee brace on June 12, 2012, (ECF No. 58-2 ¶ 33; ECF No. 62-6 ¶ 33);

- Romero saw Gehrmann again on June 26, 2012, who noted "drastic" improvement in Romero's range of motion and recommended continuing non-operative treatment and use of the hinged knee brace, (ECF No. 58-2 ¶ 34; ECF No. 62-6 ¶ 34);

- Romero had a follow-up examination at University Hospital on March 12, 2013, (ECF No. 58-2 ¶ 35; ECF No. 62-6 ¶ 35);

- Romero reinjured his knee on May 2, 2013, (ECF No. 58-2 ¶ 37; ECF No. 62-6 ¶ 37);

- Romero received an x-ray on June 20, 2013, which showed mild osteoarthritis in his right knee, (ECF No. 58-2 ¶ 38; ECF No. 62-6 ¶ 38);

- Ahsan saw Romero on July 1, 2013 and recommended continuing use of the knee brace, (ECF No. 58-2 ¶ 39; ECF No. 62-6 ¶ 39);

- On May 1, 2014, Ahsan requested another orthopedic consultation concerning Romero's knee, (ECF No. 58-2 ¶ 43; ECF No. 62-6 ¶ 43);

- Romero underwent another MRI scan on May 15, 2014, (ECF No. 58-2 ¶ 45; ECF No. 62-6 ¶ 45);

- Romero saw another orthopedist at Cooper Hospital on August 19, 2014, who gave

    Romero a corticoid injection and advised him to continue using his knee brace and to

    follow up regarding potential surgery, (ECF No. 58-2 ¶ 47; ECF No. 62-6 ¶ 47);

- At a September 12, 2014 appointment, non-party Dr. Pollard advised that Romero

    should be scheduled for knee surgery, (ECF No. 58-2 ¶ 48; ECF No. 62-6 ¶ 48);

- Dr. Pollard performed ACL-repair surgery on Romero's right knee on October 22,

    2014, (ECF No. 58-2 ¶ 50; ECF No. 62-6 ¶ 50).

As a part of his Eighth Amendment claim, Romero argues that Ahsan rendered

inadequate treatment both by denying surgery and by delaying Romero's receipt of the hinged

knee brace.  (ECF No. 1 ¶¶ 28–30.)  In support of summary judgment, Ahsan argues that Romero

cannot prove either that he suffered a serious medical condition or that Ahsan was deliberately

indifferent to it.  (ECF No. 58-1 at 6–13.)  Addressing the first prong, Ahsan argues that

Romero's injury was not a serious medical need because it "did not cause Plaintiff a lifelong

handicap or permanent loss."  (*Id.* at 8.)  He further contends that Romero has admitted that the

period between the injury and the surgery did not result in any additional damage.  (*Id.*)

Considering the evidence before the Court, I reject Ahsan's argument that Romero's knee

injury cannot be considered a serious medical need.  Applying the test used by the Third Circuit

in *Mattern*, it is clear that Romero's torn ACL, meniscal tear, and other knee damage constituted

a condition that was "diagnosed by a physician as requiring treatment"—indeed, Ahsan was one

of the several physicians who diagnosed Romero's injury as requiring treatment.  *See Mattern*,

657 F. App'x at 139.  Decisions from within this circuit have repeatedly found similar knee

injuries to constitute serious medical needs for the purposes of inadequate-treatment claims.  *See*

*McGinnis v. Hammer*, ___ F. App'x ___, 2018 WL 4334104, at *1–2 (3d Cir. Sept. 11, 2018);

*Williams v. Kort*, 223 F. App'x 95, 100 (3d Cir. 2007); *Vasiliades v. Angud*, Civ. No. 17-11764 (RMB), 2018 WL 4516975, at *4 (D.N.J. Sept. 20, 2018); *Young v. Speziale*, Civ. A. No. 07-3129 (SDW), 2009 WL 3806296, at *5 (D.N.J. Nov. 10, 2009). Ahsan has shown no basis to distinguish Romero's injuries from the circumstances considered in the above-cited cases. As such, I find that Romero's knee injury was a serious medical condition.

Turning to the question of the treatment rendered, Ahsan contends that disagreements between doctor and inmate-patient, or among doctors, as to the proper course of treatment will not suffice to support an Eighth Amendment claim. (ECF No. 58-1 at 9–10.) Ahsan argues that Romero "bases his claim on his subjective complaint that he was not treated as quickly as he would have liked with regard to obtaining the knee brace, having an MRI or having knee surgery performed" and that "his personal beliefs or opinions regarding treatment do not rise to the level of deliberate indifference." (*Id.* at 12.) Ahsan contends that Romero has produced no evidence to show that any delay in treatment was intentional. (*Id.*) He emphasizes the continuing treatment provided Romero in the wake of his injury and that an orthopedist recommended that Romero not undergo surgery at that time. (*Id.* at 12–13.)

In opposition, Romero contends that Ahsan demonstrated deliberate indifference by indicating that Romero would not receive surgery because of the Remedy Forms he had filed. (ECF No. 62 at 9–10.) Romero stresses that it was only after he commenced this action that he was again referred to an orthopedist for surgery. (*Id.* at 10–11.)

When a plaintiff was provided with some care, the deliberate indifference prong involves both an assessment of the adequacy of the care received and an examination of the defendant's underlying state of mind. *Pearson*, 850 F.3d at 535–36. To overcome the presumption that provided medical care was adequate, there must be evidence showing that the care violated

professional norms. *Id.* at 536. "'[M]ere disagreement as to the proper course of medical treatment' . . . is insufficient to state an Eighth Amendment claim." *Artis v. Jin*, 642 F. App'x 92, 95 (3d Cir. 2016) (quoting *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004). As an extension of this principle, there is also no actionable claim that arises "when a *doctor* disagrees with the professional judgment of another doctor," because "[t]here may . . . be several acceptable ways to treat an illness." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990); *see also DeFranco v. Wolfe*, 387 F. App'x 147, 158 (3d Cir. 2010) ("[D]isagreement of professional opinion among doctors does not equal deliberate indifference.").

The evidence before the Court demonstrates that Romero received extensive and generally prompt medical treatment for his knee injury. (*See generally* ECF Nos. 57, 58-2, 62-5, 62-6, 65-2.) Thus, there is no suggestion that Ahsan refused to provide care. Instead, Romero's claim in this context complains of inadequate care. The evidence surrounding whether Romero should have undergone immediate surgery, however, contains no support for a finding that the care he received was inadequate. Although, Shakir, the first orthopedist to examine Romero, opined that surgery was necessary, he then recommended that Romero see a tertiary-care provider regarding such surgery. (*See* ECF No. 57 at ECF pp. 31–32.) Ahsan followed that recommendation, and sent Romero to Gehrmann, an orthopedist at the hospital, for potential surgery. Gehrmann, however, recommended that Romero wear a hinged knee brace and undergo physical therapy. (*See* ECF No. 57 at ECF p. 24.) At follow-up appointments with Gehrmann's office, further non-operative treatment was recommended. (*See* ECF No. 57 at ECF pp. 101–06.) Notes from these visits indicate that the doctors in that office consistently considered the possibility of surgery, but found that, given all circumstances, continuing with non-operative treatment was preferable. (*Id.* ("[H]e is not a good operatie [sic] candidate given the specific

rehab measures that would be required. It was explained to the patient that he could actually end up with worse outcomes if he had the surgery and then did not have the specific rehab required.").) While Miller, Romero's physical therapist, expressed his opinion that surgery would be necessary, he also indicated that he would defer to the opinions of orthopedist. (*See* ECF No. 63 at ECF p. 2.)

Thus, this was not a situation in which a recommendation for treatment went completely ignored. Although one orthopedist initially recommended that Romero undergo surgery, another subsequently developed a non-operative course of treatment based on concerns that surgery could be more harmful than beneficial. As such, the evidence does not support a finding that the non-operative medical treatment that Romero initially received instead of surgery was inadequate; instead, it reveals that the treatment provided was fully consistent with the professional recommendations of a consulting specialist.[9] Accordingly, summary judgment is granted to Ahsan as to the surgery-related portion of Romero's inadequate-treatment claim.

The one area in which the evidence leaves some question as to the adequacy of care is the delay in Romero's receipt of a hinged knee brace, which Romero also singled out as a part of his inadequate-treatment claim. In his Complaint, Romero alleged that "defendants deliberate delayed [sic] in providing a hinged knee brace to prolong plaintiff's pain and suffering violates the Eighth Amendment . . . because plaintiff filed grievances against them." (ECF No. 1 ¶ 29.)

The evidence before the Court on this motion does seem to indicate an unexplained delay in obtaining the hinged knee brace that was prescribed for Romero. Gehrmann, in advising

---

[9] Romero does not allege that Ahsan sought out a second specialist opinion for the purpose of obtaining a recommendation of non-operative treatment, nor would the evidence support such a theory, as the record shows that it was Shakir, the orthopedist who first recommended surgery, who advised that Romero should consult with a tertiary-care provider. (*See* ECF No. 57 at ECF p. 32.)

against immediate surgery, recommended on February 13, 2012, that Romero receive a hinged knee brace. (ECF No. 58-2 ¶ 28; ECF No. 62-6 ¶ 28.) Additionally, Ahsan himself had referred to the need of obtaining a hinged knee brace for Romero as early as January 12, 2012. (ECF No. 57 at ECF pp. 48, 52–53.) Although it appears that Ahsan may have ordered a hinged knee brace for Romero on February 14, 2012, (ECF No. 57 at ECF p. 24; ECF No. 58-2 ¶ 29), Romero did not actually receive a hinged knee brace until June 12, 2012. (ECF No. 58-2 ¶ 33; ECF No. 62-6 ¶ 33.) Indeed, chart notes from healthcare providers during this period make note of the fact that Romero had not yet received it. (*See* ECF No. 57 at ECF pp. 23 (noting, on February 15, 2012, "still waiting for R-knee brace for movement"), 105 (noting, on March 28, 2012, "[u]fortunately, we were unable to obtain a hinged knee brace for the patient at todays visit").) The evidence contains no indication as to the reason for this lengthy delay in obtaining the hinged knee brace that had been prescribed. Accordingly, there is a factual question regarding whether the long-delayed knee brace constitutes inadequate treatment.

Even if the delay could be considered inadequate treatment, however, there remains the question of whether the delay can be shown to have been the product of Ahsan's disregard for Romero's medical needs. *See Parkell*, 833 F.3d at 337. As noted above, Ahsan argues that there is no evidence that shows any delay in providing treatment was intentional. (*See* ECF No. 58-1 at 12.) Romero's brief in opposition does not respond as to the alleged delay in receiving the knee brace at all, much less point to evidence showing that such delay was intentional, rather than merely inadvertent. (*See* ECF No. 62.)

Therefore, absent any evidence from Romero, the Court agrees with Ahsan that there is no evidence of intentional disregard—or anything beyond inadvertence—in the delay of providing Romero a hinged knee brace. Romero concedes that the medical records indicate that

Ahsan placed an order for such a knee brace on February 14, 2012. Even accepting Romero's allegation that Ahsan at some point told Romero that he would not receive surgery because of his grievances, such a comment would not seem to relate to the knee-brace delay. Thus, Ahsan has met his burden on this motion by pointing to the lack of evidence that the delay was deliberate. *See Celotex Corp.*, 477 U.S. at 325. Romero has not refuted this point. Accordingly, summary judgment is granted to Ahsan on the inadequate-treatment claim.

### E. First Amendment Retaliation Standard

An incarcerated plaintiff pleads a claim for retaliation by alleging that "(1) he engaged in constitutionally protected conduct[,] (2) he suffered an adverse action[,] and (3) the constitutionally protected conduct was a substantial or motivating factor for the adverse action." *Brant v. Varano*, 717 F. App'x 146, 149 (3d Cir. 2017); *see also Rauser v. Horn*, 241 F.3d 330, 333–34 (3d Cir. 2001). "'[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.'" *Allah v. Seiverling*, 229 F.3d 220, 224–25 (3d Cir. 2000) (alteration in original) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999)); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). It is well established that an inmate's filing of a grievance constitutes conduct protected by the First Amendment. *See Laurensau v. Romarowics*, 528 F. App'x 136, 139 (3d Cir. 2013); *Mack v. Yost*, 427 F. App'x 70, 72 (3d Cir. 2011) ("Filing a formal prison grievance clearly constitutes protected activity . . . ."); *see also Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016), *cert. denied sub nom. Coutts v. Watson*, 137 S. Ct. 2295 (2017); *Mitchell*, 318 F.3d at 530.

An action is considered adverse if it would be "sufficient to deter a person of ordinary firmness from exercising his constitutional rights" *Mack v. Warden Loretto FCI*, 839 F.3d 286,

297 (3d Cir. 2016); *see also Watson*, 834 F.3d at 422 n.6; *Mitchell*, 318 F.3d at 530. Whether the action in question meets this standard "is an objective inquiry and ultimately a question of fact." *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012); *see also Allah*, 229 F.3d at 225.

Once a plaintiff has shown evidence of protected conduct and an adverse action, the question become showing a causal link between the two. *See Rauser*, 241 F.3d at 333. At that stage, the plaintiff first bears the burden to show that the protected conduct was a "substantial or motivating factor" underlying the adverse action, and the burden then shifts to the defendant to show that it would have taken the same action regardless of the plaintiff's protected conduct. *Id; see also Watson*, 834 F.3d at 831. Where a causal link cannot be shown with direct evidence, a plaintiff may try to satisfy the initial burden by demonstrating "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson*, 834 F.3d at 422.

## F. First Amendment Retaliation Analysis

In his Complaint, Romero alleged that both the denial of surgery and the delay of receiving the knee brace constituted retaliation for his filing of Remedy Forms. (*See* ECF No. 1 ¶¶ 35–37.) Ahsan primarily argues that summary judgment must be granted to him on this claim because he was never aware of Romero filing any grievance against him and therefore could not have retaliated against Romero for doing so. (ECF No. 58-1 at 14–16.) Instead, Ahsan asserts that all decisions were based on medical judgment. (*Id.* at 15.) He contends that "[w]ithholding medical treatment that plaintiff subjectively believes he needs or desires to receive will not constitute retaliatory conduct." (*Id.* (citing *Baumgardner v. Ebbert*, 535 F. App'x 72, 76–77 (3d Cir. 2013)).) In response, Romero argues that the prolonged denial of surgery constituted an adverse action motivated by Romero's grievances. (*See* ECF No. 62 at 12–13.)

For the sake of clarity, I will repeat the relevant facts as they relate to Romero's inadequate-treatment claim:

- Ahsan examined Romero on December 28, 2011, the day of his injury, and ordered an orthopedic consultation, (ECF No. 58-2 ¶¶ 1, 5; ECF No. 62-6 ¶¶ 1, 5);

- Following various preliminary treatments and a January 11, 2012, MRI scan, Ahsan diagnosed Romero with an acute right knee sprain with a complete tear of the ACL, medial meniscal tear, and lateral ligament tear; Ahsan ordered an orthopedic consultation "ASAP for likely surgery," (ECF No. 58-2 ¶¶ 15–18; ECF No. 62-5 ¶ 10; ECF No. 62-6 ¶¶ 15–18; ECF No. 65-2 ¶ 10);

- After an orthopedic consultation, a treatment plan was proposed, including a knee immobilizer for two weeks, followed by a hinged knee brace for three months, (ECF No. 58-2 ¶ 19; ECF No. 62-6 ¶ 19);

- On January 18, 2012, Romero received a knee immobilizer, (ECF No. 58-2 ¶ 20; ECF No. 62-6 ¶ 20);

- In late January 2012, Romero had an orthopedic consultation with Shakir, who recommended surgery to reconstruct the ACL and the PCL; Shakir would not do the surgery himself, but recommended that Romero be sent to a tertiary care center for evaluation, (ECF No. 58-2 ¶¶ 24–25; ECF No. 62-6 ¶¶ 24–25);

- Thereafter, Ahsan ordered that Romero be sent to University Hospital for an evaluation, (ECF No. 58-2 ¶ 26; ECF No. 62-6 ¶ 26);

- On February 13, 2012, Romero underwent an orthopedic evaluation by Gehrmann, who recommended a hinged knee brace, range-of-motion exercises, and six weeks of physical therapy, (ECF No. 58-2 ¶ 28; ECF No. 62-6 ¶ 28);

- Ahsan ordered a hinged knee brace the following day, (ECF No. 58-2 ¶ 29; ECF No. 62-6 ¶ 29);

- Romero "understood that he needed to strengthen his right knee before undergoing surgery" and "did not object to the proposed plan of treatment," (ECF No. 58-2 ¶ 30; ECF No. 62-6 ¶ 30);

- Romero was seen by another orthopedist on March 27, 2012, who again recommended a hinged knee brace, (ECF No. 58-2 ¶ 33; ECF No. 62-6 ¶ 33);

- Upon his discharge from physical therapy on May 11, 2012, the physical therapist opined that surgery might be required, (*see* ECF No. 62-5 ¶ 23; ECF No. 65-2 ¶ 23);

- Romero received a hinged knee brace on June 12, 2012, (ECF No. 58-2 ¶ 33; ECF No. 62-6 ¶ 33);

- Romero saw Gehrmann again on June 26, 2012, who noted "drastic" improvement in Romero's range of motion and recommended continuing non-operative treatment and use of the hinged knee brace, (ECF No. 58-2 ¶ 34; ECF No. 62-6 ¶ 34);

- Romero reinjured his knee on May 2, 2013, (ECF No. 58-2 ¶ 37; ECF No. 62-6 ¶ 37);

- On May 1, 2014, Ahsan requested another orthopedic consultation concerning Romero's knee, (ECF No. 58-2 ¶ 43; ECF No. 62-6 ¶ 43);

- Thereafter, Dr. Pollard advised that Romero should be scheduled for knee surgery, (ECF No. 58-2 ¶ 48; ECF No. 62-6 ¶ 48);

- Dr. Pollard performed ACL-repair surgery on Romero's right knee on October 22, 2014, (ECF No. 58-2 ¶ 50; ECF No. 62-6 ¶ 50);

- Romero testified that when he submitted a form to receive medical care, he was never denied care, (ECF No. 58-2 ¶ 53; Declaration of Margaret Raymond-Flood, ECF No. 58-4, Ex. B, Tr. of Dep. of Romero (May 5, 2015), at ECF p. 7; ECF No. 62-6 ¶ 53);

- Ahsan's duties as medical director included reviewing recommendations for prisoners to see specialists, (*see* ECF No. 62-5 ¶ 15; ECF No. 65-2 ¶ 15);

- Ahsan testified that he will not necessarily take a specialist's recommendation, but instead "will evaluate the recommendation and then [he] will determine whether the recommendation is medically necessary or not," (ECF No. 65-2 ¶ 19 (quoting ECF No. 58-4 at ECF p. 15); *see also* ECF No. 62-5 ¶ 19).

In addition to the dispute as to whether Romero actually filed Remedy Forms concerning Ahsan, already considered at length in this opinion, the evidence before the Court includes at least two explicit factual disputes:

- While Ahsan testified that he had no knowledge of any grievance filed against him by Romero, (ECF No. 58-2 ¶ 55; ECF No. 65-2 ¶¶ 6, 12; ECF No. 58-4 at ECF p. 18), Romero testified that he told Ahsan on January 3, 2012 that he would file a grievance against him and that Ahsan was aware of his efforts to file grievances, (ECF No. 62-5 ¶¶ 6, 12; ECF No. 62-6 ¶ 55; Certif. of Surinder K. Aggarwal, Ex. C, Tr. of Dep. of Romero (May 5, 2015), ECF No. 62-2, at ECF pp. 38–39, 41);

- Romero testified that, on January 7, 2012, Ahsan told Romero that he would receive non-operative treatment and that prisoners who filed grievances do not get surgery, (ECF No. 62-5 ¶ 8; ECF No. 62-2 at ECF pp. 39, 46–48), but Ahsan denies this and argues that "[t]here is no medical record that indicates Plaintiff was seen by Dr. Ahsan on January 7, 2012," (ECF No. 58-4 at ECF P. 18; ECF No. 65-2 ¶ 8).

As a preliminary matter, Romero's retaliation claim insofar as it concerns the hinged knee brace must fail on these facts. While the record does indicate an unexplained delay in the provision of the hinged knee brace, Romero has introduced no evidence of any link between the delay and any intention by Ahsan to retaliate for grievance filings. Indeed, Romero even seems to abandon this theory of the claim in his opposition brief, including no reference to the delayed brace. (*See* ECF No. 62 at 12–13.)

Assessing the claim as it concerns the alleged denial of surgery, it is clear that Ahsan's main contention—that he had no awareness of any grievances or that Romero never filed any—plainly presents factual questions that would require the Court to weigh the credibility of Ahsan against Romero, who claims that he filed grievances and told Ahsan he was doing so. Of course, the Court cannot resolve such credibility questions on a motion for summary judgment. Indeed, any determination concerning Ahsan's intents or purposes would seem to require resolution of factual questions that cannot be reached at this time.

Turning to the adverse-action element, the litigants seem to assume that the analysis of whether Ahsan provided medically inadequate treatment and the analysis of whether Ahsan took an adverse action against Romero will be the same. (*See* ECF No. 58-1 at 14–15; ECF No. 62 at 12–13.) As explained above, however, it is well established that an act does *not* need to be a standalone constitutional violation to be considered an adverse action. *See Allah*, 229 F.3d at 224–25. Considering whether treatment provided was, objectively, medically adequate, involves no examination of the state of mind of either the doctor or the patient, and there is a presumption that treatment was adequate in the absence of evidence to the contrary. *See Pearson*, 850 F.3d at 535–36. Conversely, determining whether an action was sufficiently adverse to support a retaliation claim requires an assessment of the psychological effect that the action would have on

a hypothetical "person of ordinary firmness." *Mack*, 839 F.3d at 297. Additionally, Ahsan's

conclusory argument that withholding medical treatment that a prisoner merely believes to be

necessary cannot support a retaliation claim seems to be without legal support.[10] Therefore, the

tests for medical inadequacy and for an adverse action are legally distinct, and there is no reason

that they must rise and fall together.

The dispositive question presented here is, thus, whether a reasonable jury could find that

a person of ordinary firmness in Romero's position would have been deterred from an exercise

of constitutional rights. *See Mack*, 839 F.3d at 297. I conclude that the evidence could not

support such a finding.

Even accepting Romero's allegation that Ahsan initially told him he would receive no

surgery because of his grievance filings, the record makes clear that Romero thereafter received

ongoing medical treatment that was consistent with the recommendations of treating

orthopedists. When Shakir recommended that Romero see another orthopedist for potential

surgery, Romero was sent for a consultation with Gehrmann, who recommended a non-operative

course of treatment. (*See* ECF No. 58-2 ¶¶ 24–28; ECF No. 62-6 ¶¶ 24–28.) Ahsan did not

stand in the way of Romero being seen by another orthopedist for potential surgery; rather, the

parties agree that Ahsan affirmatively sent Romero to that appointment based on Shakir's

recommendation. (*See* ECF No. 58-2 ¶ 26; ECF No. 62-6 ¶ 26.) Indeed, there is no indication

that Ahsan at any point interfered with Romero's course of orthopedic treatment or declined to

---

[10] The case cited following this assertion, *Baumgardner v. Ebbert*, 535 F. App'x 72 (3d Cir. 2013), affirmed grants of motions to dismiss and for summary judgment as to a retaliation claim, among other claims. *See Baumgardner*, 535 F. App'x at 76–77. The Court found Baumgardner's allegations to be "vague, nonspecific statements" and it found "no evidence in the record to create an issue of material fact." *Id.* No part of the *Baumgardner* opinion, however, suggests that a denial of medical care that the patient subjectively believes is necessary can never, as a matter of law, constitute an adverse action. *See id.*

follow the recommendation of consulting orthopedic specialists:  when Shakir recommended that Romero see another orthopedist, Romero was sent to another orthopedist, (ECF No. 58-2 ¶¶ 24–28; ECF No. 62-6 ¶¶ 24–28); when Gehrmann recommended that Romero receive non-operative treatment, including physical therapy, Romero received this treatment, (ECF No. 58-2 ¶¶ 28–34; ECF No. 62-6 ¶¶ 28–34); when, in 2014, (following an apparent re-injury), an orthopedist recommended surgery, Romero received surgery, (ECF No. 58-2 ¶¶ 37, 43–50; ECF No. 62-6 ¶ 37, 43–50).  Romero also testified that he had never been refused treatment after filling out the proper form to request medical treatment.  (ECF No. 58-4 at ECF p. 7.)

Taking account of these circumstances, no reasonable factfinder could conclude that a person of ordinary firmness in Romero's position would be deterred from exercising the First Amendment right to file grievances. [11]  Regardless of what Ahsan may have said to Romero, the evidence demonstrates no actual interference by Ahsan in Romero's course of treatment, as recommended by specialist physicians.  *Cf. Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009) (holding that "threats alone do not constitute retaliation").  Accordingly, as the facts in this case do not a support a finding that Romero was subjected to an adverse action, summary judgment is granted on this claim.

---

[11]  And, indeed, the record reflects that Romero in fact continued to file grievances during this time.  (*See* ECF No. 90-2 at ECF pp. 10–14.)

## V.   CONCLUSION

For the foregoing reasons, the Court finds that Ahsan has not met his burden of proving the affirmative defense that Romero's claims are barred by his failure to exhaust administrative remedies.  Nevertheless, Ahsan's motion for summary judgment (ECF No. 58) is GRANTED on the merits, and judgment is granted in his favor.  An appropriate order follows.

DATED:  December 20, 2018                              /s/ Freda L. Wolfson
                                                                        FREDA L. WOLFSON
                                                                        United States District Judge